IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

AXEL DIAZ,

                              Petitioner,

          v.

MARION SPEARMAN,

                              Respondent.

NO. C13-0466 TEH

ORDER DENYING PETITION
FOR WRIT OF HABEAS
CORPUS AND DENYING
CERTIFICATE OF
APPEALABILITY

United States District Court
For the Northern District of California

        Petitioner Axel Diaz, also referred to as Axel Diaz-Higareda or Axel Diaz-Higarida,
seeks a writ of habeas corpus under 28 U.S.C. § 2254.  After carefully reviewing the parties'
written arguments, the record, and governing law, the Court now DENIES the petition for the
reasons set forth below.

## I.      BACKGROUND

        Petitioner was sentenced to six years in prison following his plea of no contest to
voluntary manslaughter and admission of a gang enhancement relating to the shooting death
of Andrew Saludes-Smith ("Saludes-Smith").  There was no trial in this case, nor was there a
direct appeal on the issues now before the Court.  The following facts, which Respondent
does not dispute, are drawn from Petitioner's Statement of the Facts, unless otherwise noted.
Pet. at 17-41.

        In the early morning of September 29, 2007, Saludes-Smith and several friends were
driving in a residential neighborhood in Santa Rosa, California, when they observed
Petitioner and a friend, Jesse Morales ("Morales"), walking on the street after leaving a
nearby party.  The party was attended by Sureño gang members and associates, but the area
in which the house was located was predominantly a Norteño gang neighborhood.  The
driver stopped the vehicle, and Saludes-Smith and Christian Gomez, both Norteño gang

members, jumped out and walked toward Petitioner and Morales.  Petitioner is an admitted
member of the Vario Sureño Locos ("VSL"), a subset of the Sureño gang.  Morales is also a
VSL gang associate.  The parties stipulated for the purposes of the preliminary hearing that
the Sureño and Norteño gangs are criminal street gangs that have engaged in a "pattern of
criminal gang activity," as set forth in California Penal Code section 186.22.  Clerk's
Transcript ("CT") 2241 (Ex. 8, Vol. 12).  The Sureños and Norteños are rivals.

Santa Rosa Police Department Detective Andrew Riley testified at a preliminary/
probable cause hearing that Petitioner stated in his police interview that as the Norteños
approached, Petitioner and Morales also both walked toward the approaching Norteños,
Saludes-Smith and Gomez.  However, during Petitioner's tape-recorded police interview
with Detectives Riley and Brian Sinigiani, for which there is a transcript, Petitioner actually
stated that he remained on the sidewalk and did not follow Morales as Morales walked
toward Saludes-Smith and Gomez.  The detective asked several questions assuming that both
Petitioner and Morales were walking toward the others, but Petitioner neither confirmed nor
denied that assumption.  CT 182-83 (Ex. 8, Vol. 1).

As the groups approached each other, Saludes-Smith demanded to know from
Petitioner and Morales "where are you from?" and accused them of being "a bunch of esses,"
Spanish for the letter "S."  "Where are you from" is a gang challenge meaning "I believe you
to be a rival," and would commonly precede an attack on a gang rival.  Petitioner was aware
that Morales was carrying a .25-caliber semiautomatic pistol that Petitioner had given him a
day or two earlier, which Petitioner contends he did so that Morales could sell the gun for
rent money.  Petitioner admitted that he believed that "we [Petitioner and Morales] were
going to throw down" – i.e. that there was going to be a fight.  Morales then responded to
Saludes-Smith's challenge by saying that he was from "Santa Rosa" or "Southwest."
Saludes-Smith put his hands in his sweatshirt pockets.  Petitioner heard a clicking sound,
which he believed was similar to a gun being cocked, but it is unclear whether Saludes-Smith
was actually armed.  Morales, who had in his hand the gun Petitioner had given him earlier,
then raised his arm and shot Saludes-Smith once in the chest.

After initially retreating to a nearby apartment, Saludes-Smith was taken to a hospital, where he was pronounced dead.  Following the shooting, Petitioner and Morales ran up the street toward a vehicle being driven by a friend – Pedro Cobarrubias – who had left the same party as Petitioner and Morales.  Petitioner and Morales got into the vehicle and left the scene.  While in the truck, Morales told Petitioner not to say anything about what had happened.  Petitioner responded that Morales need not worry about that.

Petitioner, who was sixteen-years old at the time of the incident, was charged with murder and participation in a criminal street gang via an information filed on October 8, 2008.  Petitioner was held to answer for these charges at a preliminary hearing.  The committing magistrate found that Morales shot Saludes-Smith, that Petitioner was not liable on a conspiracy theory, but that there was sufficient probable cause to hold Petitioner to answer on the charges of murder under an aiding and abetting/natural and probable consequences theory based on the facts that Morales walked toward Saludes-Smith and his Norteño companion as both advanced toward Petitioner, and that Petitioner admitted that he thought there was going to be a fight.  CT 1871-1882 (Ex. 8, Vol. 10).

Petitioner filed a motion to dismiss the charges pursuant to California Penal Code section 995 on the basis that Petitioner could not be found liable for murder under an aiding and abetting/natural and probable consequences theory.  On April 24, 2009, the judge denied the motion.  Reporters Transcript ("RT") 201-05 (Ex. 7, Vol. 5).  On May 25, 2010, the District Attorney filed an amended information that added a voluntary manslaughter charge with a gang enhancement under California Penal Code section 186.22(b)(1)(C).  Petitioner pleaded no contest to this charge and was sentenced to state prison for six years.

Petitioner appealed his sentence in state court on grounds that his presentence credits were miscalculated; he also simultaneously filed a petition for a writ of habeas corpus in state court, raising the same habeas claims at issue here.[1]  On October 28, 2011, the California Court of Appeal rejected the appeal and summarily denied the habeas petition.

---

[1] *See* Part III, *infra*, for discussion of habeas claims.

United States District Court

For the Northern District of California

1    Petitioner subsequently filed a petition for writ of habeas corpus in the Superior Court

2    for the County of Sonoma.  The Superior Court concluded that the petition raised the same

3    claims as the earlier petition filed in the appellate court and denied the petition summarily on

4    May 29, 2012.  Petitioner's request for habeas relief was also denied by the California Court

5    of Appeal on October 12, 2012.  Petitioner then filed a petition for writ of habeas corpus

6    before the California Supreme Court, which summarily denied the petition on January 23,

7    2013.

8    On February 1, 2013, Petitioner filed a petition for writ of habeas corpus in this Court,

9    which has subject matter jurisdiction under 28 U.S.C. § 2254.  Venue is proper in this district

10   under 28 U.S.C. § 2241(d), and the parties do not dispute that Petitioner has exhausted his

11   state remedies as to all of the claims presented in the petition.  The parties also do not dispute

12   that the petition is timely.

13

14   **II.      STANDARD OF REVIEW**

15   Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this

16   Court cannot grant a writ of habeas corpus with respect to any claim that was adjudicated on

17   the merits in state court unless the state court's adjudication of the claim was: (1) "contrary

18   to" clearly established federal law as determined by the Supreme Court, (2) "involved an

19   unreasonable application of" such clearly established law, or (3) "was based on an

20   unreasonable determination of the facts" in light of the record before the state court.  28

21   U.S.C. § 2254(d).

22   A state court's decision is "contrary to" clearly established Supreme Court law "if the

23   state court arrives at a conclusion opposite to that reached by [the] Court on a question of law

24   or if the state court decides a case differently than [the] Court has on a set of materially

25   indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  A decision is an

26   "unreasonable application" of clearly established law if "the state court identifies the correct

27   governing legal principle from [the Supreme] Court's decisions but unreasonably applies that

28   principle to the facts of the prisoner's case." *Id.* at 413.  A state court decision "based on a

1  factual determination will not be overturned on factual grounds unless objectively

2  unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v.*

3  *Cockrell*, 537 U.S. 322, 340 (2003).

4       Section 2254(d) applies even where, as here, the state court summarily denied the

5  state habeas petition without a reasoned opinion. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1402

6  (2011); *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011).  "Under California law, the

7  California Supreme Court's summary denial of a habeas petition on the merits reflects that

8  court's determination that 'the claims made in th[e] petition do not state a prima facie case

9  entitling the petitioner to relief.'" *Pinholster*, 131 S. Ct. at 1403 n.12 (citation omitted).  In

10 challenging a summary denial, Petitioner "can satisfy the 'unreasonable application' prong of

11 § 2254(d)(1) only by showing that 'there was no reasonable basis' for the California

12 Supreme Court's decision." *Pinholster*, 131 S. Ct. at 1402 (quoting *Richter*, 131 S. Ct. at

13 784).  "In other words, where a state court issues a summary denial, 'a habeas court must

14 determine what arguments or theories . . . could have supported the state court's decision;

15 and then it must ask whether it is possible fairminded jurists could disagree that those

16 arguments or theories are inconsistent with the holding in a prior decision of [the Supreme]

17 Court.'" *Sully v. Ayers*, 725 F.3d 1057, 1067 (9th Cir. 2013) (quoting *Richter*, 131 S. Ct. at

18 786).

19

20 **III.   DISCUSSION**

21       Petitioner raises five claims in his habeas corpus petition: (1) that there was no

22 evidence upon which a reasonable trier of fact could find beyond a reasonable doubt that

23 Petitioner was guilty of voluntary manslaughter or any greater crime; (2) that a magistrate

24 held petitioner to answer and the court denied a motion to dismiss in reliance on false

25 testimony of a detective who stated that Petitioner walked toward the gang members who

26 initiated a challenge, when Petitioner said he remained on the sidewalk; (3) that even if the

27 detective were to be believed, there was no evidence upon which a reasonable trier of fact

28 could conclude a factual basis existed for the plea; (4) that Petitioner's attorney advised him

**United States District Court**
For the Northern District of California

1    to plead "no contest" and to agree to a six-year term despite the lack of evidence and factual

2    basis for the plea; and (5) that his plea was not knowing and intelligent where he did not

3    understand he could not be found guilty without evidence that he knew his co-defendant

4    intended to commit a crime.  Pet. at 7-8.

5         Ultimately, these habeas claims must be denied because Petitioner cannot show that

6    the California Supreme Court's summary denial of relief was contrary to, or involved an

7    unreasonable application of, Supreme Court precedent or was based on an unreasonable

8    determination of the facts.  The Court addresses Petitioner's claims thematically rather than

9    sequentially.

10

11                    **A.        Reliance on False Testimony Prior to Plea (Second Claim)**

12        Petitioner argues that he is entitled to habeas corpus relief because of the trial court's

13    reliance on the false testimony of a police officer (his Second Claim).  Pet. at 46-49 (citing

14    *Napue v. Illinois*, 360 U.S. 264, 269 (1959)).  He argues that the magistrate's erroneous

15    finding that Petitioner could be held to answer for murder on an aiding and abetting/natural

16    and probable consequences theory was based on Detective Riley's false testimony that

17    Petitioner and Morales were walking toward the approaching Norteño gang members when,

18    in fact, a tape recording of the interview indicates that Petitioner said he remained on the

19    sidewalk as only Morales advanced.  Pet. at 46-49.  During the interview, Detective Riley

20    asked several questions assuming that both Petitioner and Morales were walking toward the

21    others, but Petitioner neither confirmed nor denied that assumption.  CT 129, 151-53, 155,

22    158, 171-74, 176, 180, 182 (Ex. 8, Vol. 1).

23        *Tollett v. Henderson*, 411 U.S. 258 (1973), bars this claim because Petitioner pleaded

24    no contest[2] to the charged offense, and thus may not raise independent claims related to the

25    deprivation of constitutional rights that occurred prior to the entry of the guilty plea.  *Id.* at

26    267.  Because this alleged constitutional violation occurred at the preliminary hearing and

27    _____

28         [2]In California, a no contest plea is the same as a guilty plea "for all purposes."  Cal.
     Penal Code § 1016(3).

United States District Court
For the Northern District of California

1    was relied upon at the motion to dismiss hearing – both of which occurred prior to entry of

2    the plea – this claim is *Tollett*-barred.  Thus, Petitioner cannot show that the California

3    Supreme Court's summary denial of relief with respect to Petitioner's Second Claim was

4    contrary to, or involved an unreasonable application of, Supreme Court precedent, or was

5    based on an unreasonable determination of the facts.

6

7            **B.       Lack of Factual Basis for No Contest Plea (Third Claim)**

8            Petitioner next argues that even if Detective Riley were to be believed, there was no

9    evidence upon which a reasonable trier of fact could conclude a factual basis existed for the

10   no contest plea to voluntary manslaughter (his Third Claim).  *See, e.g.*, Pet. at 59 ("the judge

11   who accepted [P]etitioner's plea . . . erred in finding a factual basis for his plea.").  This

12   claim also fails as Petitioner "cannot obtain habeas relief because the state trial court's failure

13   to find a factual basis for his no contest plea – unaccompanied by protestations of innocence

14   – does not present a constitutional issue cognizable under 28 U.S.C. § 2254."  *Loftis v.*

15   *Almager*, 704 F.3d 645, 648 (9th Cir. 2012) *cert. denied*, 134 S. Ct. 107 (2013).  Because

16   Petitioner did not proclaim his innocence at the plea hearing, *see, supra,* Part III(C)(4)

17   (describing plea colloquy), Petitioner cannot show that the California Supreme Court's

18   summary denial of relief with respect to Petitioner's Third Claim was contrary to, or

19   involved an unreasonable application of, Supreme Court precedent, or was based on an

20   unreasonable determination of the facts.

21

22           **C.       Plea Neither Knowing Nor Intelligent Due To Ineffective Assistance**
                         **of Counsel (First, Fourth, and Fifth Claims)**
23

24           The Court construes Petitioner's remaining claims as part of a single interlocking

25   argument.  Petitioner argues that his plea was neither knowing nor intelligent (his Fifth

26   Claim) because his lawyer provided him ineffective assistance by advising him to plead "no

27   contest" and to agree to a six-year term when he failed to inform him (his Fourth Claim) that

28   no evidence existed from which any reasonable trier of fact could find beyond a reasonable

doubt that Petitioner was guilty of voluntary manslaughter or any greater crime (his First Claim).  Akin to reconstructing a Russian nesting doll, the Court first concludes that sufficient evidence existed from which any reasonable trier of fact could find beyond a reasonable doubt that Petitioner was guilty of voluntary manslaughter, such that his ineffective assistance of counsel claim fails, along with his challenge to the knowing and intelligent nature of his no contest plea.  Thus, for the reasons discussed below, Petitioner's First, Fourth, and Fifth Claims for habeas relief fail.

### 1.    Applicable Law

Because Petitioner pleaded no contest upon the advice of counsel, he is limited to challenging his plea by demonstrating that the advice he received from counsel did not constitute effective representation.  *Lambert v. Blodgett*, 393 F.3d 943, 979 (9th Cir. 2004); *Hill v. Lockhart*, 474 U.S. 52, 56-57 (1985).

The Supreme Court has held that the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), applies to challenges to guilty pleas based upon ineffective assistance of counsel.  *Hill*, 474 U.S. at 57-59.  Under that test, a federal habeas petitioner must establish two things: (1) that counsel's performance was deficient because it fell below an "objective standard of reasonableness" under prevailing professional norms; and (2) that petitioner was prejudiced by counsel's deficient performance, that is, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 687-88, 694; *see also Hill*, 474 U.S. at 59 (prejudice requirement in plea context focuses on whether ineffective assistance affected outcome of plea process).

"In the context of a guilty plea, the ineffectiveness inquiry probes whether the alleged ineffective assistance impinged on the defendant's ability to enter an intelligent, knowing and voluntary plea of guilty."  *Lambert*, 393 F.3d at 979-80.  Where counsel misadvised a defendant about the law during a plea negotiation, or improperly coerced a defendant to accept a plea bargain, counsel's performance may be found to have been deficient.  *Cf. Lafler*

8

1   *v. Cooper*, —— U.S. ——, 132 S. Ct. 1376, 1384 (2012) (counsel's erroneous legal advice

2   about possibility of conviction that led to rejection of plea offer constituted deficient

3   performance).  Because of the difficulty in evaluating counsel's performance, there is a

4   "strong presumption that counsel's conduct falls within the wide range of reasonable

5   professional assistance."  *Strickland*, 466 U.S. at 689; *see also Richter*, 131 S. Ct. at 788

6   ("The question is whether an attorney's representation amounted to incompetence under

7   'prevailing professional norms,' not whether it deviated from best practices or most common

8   custom." (citing *Strickland*, 466 U.S. at 690)).  In addition, the petitioner must overcome the

9   presumption that, under the circumstances, a challenged action might be considered sound

10  strategy. *Id.*

11         To satisfy the second prejudice prong in a plea bargain context, a habeas petitioner

12  must show that "there is a reasonable probability that, but for counsel's errors, he would not

13  have pleaded guilty and would have insisted on going to trial."  *Hill*, 474 U.S. at 59 (citations

14  omitted).  In other words, a petitioner must convince the habeas court that a decision to reject

15  a plea bargain would have been rational under the circumstances.  *Padilla v. Kentucky*, 559

16  U.S. 356, 372-73 (2010).  Under *Strickland*, a petitioner bears the burden of establishing both

17  deficient performance and prejudice.  *Taylor*, 529 U.S. at 390-91.  However, a court

18  evaluating an ineffective assistance of counsel claim need not address both components of

19  the *Strickland* test if the Petitioner cannot satisfy either one of them.  *Strickland*, 466 U.S. at

20  697.

21         While "[s]urmounting *Strickland*'s high bar is never an easy task . . . [e]stablishing

22  that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more

23  difficult" because the "standards created by *Strickland* and § 2254(d) are both 'highly

24  deferential,' . . .  and when the two apply in tandem, review is 'doubly' so."  *Richter*, 131 S.

25  Ct. at 788 (citations omitted); *see also Pinholster*, 131 S. Ct. at 1403.  Thus, "[w]hen §

26  2254(d) applies, the question is not whether counsel's actions were reasonable.  The question

27  is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential

28  standard."  *Richter*, 131 S. Ct. at 788.

United States District Court

For the Northern District of California

1    Petitioner's ineffective assistance of counsel claim is premised on his argument that

2    there was insufficient evidence upon which he could have been convicted of voluntary

3    manslaughter conviction, and thus his counsel's advice to plead no contest to that charge fell

4    below an objective standard of reasonableness.  As a matter of federal constitutional law,

5    "the Due Process Clause protects the accused against conviction except upon proof beyond a

6    reasonable doubt of every fact necessary to constitute the crime with which he is charged."

7    *In re Winship*, 397 U.S. 358, 364 (1970).  In *Jackson v. Virginia*, the Supreme Court framed

8    the relevant sufficiency of the evidence inquiry as: "whether, after viewing the evidence in

9    the light most favorable to the prosecution, *any* rational trier of fact could have found the

10   essential elements of the crime beyond a reasonable doubt."  443 U.S. 307, 319 (1979)

11   (emphasis in original).  While sufficiency of the evidence review is grounded in the

12   Fourteenth Amendment, the Court undertakes the inquiry with reference to the elements of

13   the criminal offense as set forth by state law.  *Jackson*, 443 U.S. at 324 n. 16.

14   Because the California courts here issued summary denials, this Court "must

15   determine what arguments or theories . . . could have supported[ ] the state court's decision;

16   and then it must ask whether it is possible fairminded jurists could disagree that those

17   arguments or theories are inconsistent with the holding in a prior decision of [the Supreme]

18   Court.'"  *Richter*, 131 S. Ct. at 786.

19

20   **2.      Sufficiency of Evidence to Support Conviction (First Claim)**

21   The Court rejects Petitioner's First Claim.  The claim is not a traditional challenge to

22   the sufficiency of the evidence that resulted in a conviction after trial; rather, because

23   Petitioner pleaded no contest, he argues that his counsel rendered ineffective assistance by

24   allowing him to plead to a charge upon which he contends no jury could have convicted him.

25   Because the Court finds that sufficient evidence existed in the record, when viewed in the

26   light most favorable to the prosecution, from which any rational trier of fact could have

27   found the essential elements of voluntary manslaughter were satisfied, his overall ineffective

28   assistance of counsel claim fails.

In California, voluntary manslaughter is the "unlawful killing of a human being without malice [and] upon a sudden quarrel or heat of passion." Cal. Penal Code § 192(a); *People v. Breverman*, 19 Cal. 4th 142, 153 (1998). To convict a defendant under an aiding and abetting/natural and probable consequences theory for voluntary manslaughter, a fact finder would need to find beyond a reasonable doubt that the defendant: (1) had knowledge of the confederate's unlawful purpose; (2) had the intent of committing, encouraging, or facilitating the commission of any target crime(s); (3) aided, promoted, encouraged, or instigated the commission of the target crime(s); whether (4) the defendant's confederate committed an offense other than the target crime(s); and whether (5) the offense committed by the confederate was a natural and probable consequence of the target crime(s) that the defendant encouraged or facilitated. *People v. Prettyman*, 14 Cal. 4th 248, 271 (1996). The "target offense is the crime that the accused parties intended to commit. The non-target is an additional unintended crime that occurs during the commission of the target." Judicial Council Of California Criminal Jury Instructions ("CALCRIM"), Instruction No. 402. In essence, the first three factors establish aiding and abetting liability, whereas factors four and five establish whether the prosecuted crime was a natural and probable consequence of the target crime in which the defendant aided or promoted. "Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense," and also that "flight is one of the factors which is relevant in determining consciousness of guilt." *In re Lynette G.*, 54 Cal. App. 3d 1087, 1094-95 (1976).

The Court's analysis is further informed by California authority interpreting the sufficiency of evidence required to convict under the natural and probable consequences doctrine. In *People v. Ayala*, 181 Cal. App. 4th 1440, 1449-50 (2010), the California Court of Appeal held that substantial evidence supported the second-degree murder conviction of a Sureño gang member under an aiding and abetting/natural and probable consequences theory where the defendant drove a car containing gang members who subsequently descended upon Norteño gang members in a planned physical attack, during which one of defendant's

United States District Court

For the Northern District of California

confederates shot and killed one of the intended victims.  In so holding, the court emphasized that "the ultimate factual question is one of reasonable foreseeability, to be evaluated under all the factual circumstances of the case."  *Id.* at 1452 (citing *People v. Medina*, 46 Cal. 4th 913, 927 (2009)).  The court rejected defendant's argument on appeal that homicide was not foreseeable because any intended assault would involve fists or a baseball bat, and that he did not know one of his gang associates had a gun.  *Id.* at 1448.  The *Ayala* court held that a reasonable juror could conclude that a reasonable person in defendant's position would have known that escalation was likely to occur when a defendant and other gang members confronted rival gang members with the original intention of only getting into a fistfight.  *Id.* at 1452-53 (citing *Medina*, 46 Cal. 4th at 922-33 ("Our Supreme Court has recognized that the gang-related nature of an assault – even one without weapons – may provide the trier of fact with sufficient evidence to conclude that "escalation of the confrontation to a deadly level was reasonably foreseeable.")).  *Ayala* and *Medina* thus stand for the proposition that in the gang context, such as here, a reasonable trier of fact could conclude that second-degree murder was a reasonably foreseeable natural and probable consequence of a defendant's aid and encouragement to get into a physical altercation with rival gangmembers – even if only a fistfight – given the potential for escalation.

While the offense here is voluntary manslaughter, given the reasoning of *Ayala*, the record reflects that there was sufficient evidence from which a factfinder could have concluded that the voluntary manslaughter of Saludes-Smith by Morales was a natural and probable consequence of certain target offenses that were aided, promoted, encouraged, or instigated by Petitioner.  A transcript of the October 6, 2007 tape-recorded interview between Petitioner and Santa Rosa Police Department Detectives Andrew Riley and Brian Sinigiani is illustrative.  During the interview, Petitioner admits that he was in the VSL gang and that Morales was a gang associate, CT 125, 142, 164; he had given Morales his gun and a full box of ammunition the day before Morales used the gun to shoot Saludes-Smith, CT 166; he knew Morales had the gun on the night of the shooting, CT 137, 166; Saludes-Smith or another individual used a gang challenge by asking Morales "Where are you from," and

when Morales responded, "Santa Rosa," the individual responded "You fool's esses," CT 153-54; Petitioner was standing approximately five to eight feet behind Morales when the shooting occurred, CT 171; as the Norteños walked toward Morales, Morales walked toward them, CT 180[3]; and following the shooting, Petitioner and Morales ran from the scene, CT 185. (Ex. 8, Vol. 1). Critically, Detective Sinigiani asked the Petitioner:

Q: What do you think – I mean, Jesse [Morales]'s walking up on these Northerners with a gun in his hand, what do you think he's going to do?

A: Uh, I didn't like, I didn't know that – like, I didn't see when (unintelligible) the gun in the hand.

Q: *I know, but I'm – listen, I mean, you've been in the game long enough to know, right? You got two Northerners and a couple of Sureños walking up on each other. One guy's got a gun in his hand. He's going to do something with it, right?*

A: *I guess.*

Q: He's either going to point it at 'em, he's going to fire a shot at 'em, he's going to do something. Right? So, you saw him walking up with the gun in his hand, right?

A: Not like, not like – I didn't see – he – he, like, I didn't think he had the gun. He was walking but didn't see gun in the hand.

Q: *Okay. Wait, you –*

A: *I know he has a gun.*

Q: *What, you knew he had a gun?*

A: *Yeah.*

Q: Okay, so he's walking up, and you kind of know something was going to go down, right?

A: Uh huh.

Q: *'Cause, you aint going to walk up on no Northerner with a gun in your pocket and not in your hand, right?*

A: *Right. Um, but I thought we were going to throw down, or like something.*

---

[3]Even if the Court were to credit Petitioner's account that he remained behind Morales on the sidewalk as opposed to advancing toward the Norteños alongside Morales, Petitioner was, by his own account, standing at most eight feet behind Morales as he advanced toward the simultaneously advancing rival gangmembers.

1    Q: What – but you ain't going to thrown[sic] down a fist, you're
     going throw it down with some –

2    A: Alright, (unintelligible) see if we threw the gun, like
3    (unintelligible)

4    Q: Mm hm.  So, Jesse knew that he was walking up and he
     probably was going to use that thing.

5    A: (Unintelligible) me.

CT 182-83 (emphasis added).

        Based on Petitioner's admissions, when viewed in a light most favorable to the

prosecution, any reasonable factfinder could have found beyond a reasonable doubt that the

elements for voluntary manslaughter under a natural and probable consequences theory were

satisfied.  Petitioner (1) had knowledge of an unlawful purpose by Morales.  Petitioner

accompanied Morales as he responded to a gang challenge from Norteños while both were in

Norteño gang territory.  RT 203-04 (Ex. 7, Vol. 5) (judge finding that shooting occurred in

Norteño territory).  Petitioner gave Morales a loaded firearm with ammunition the day before

and had seen Morales with the gun that night.  Critically, Petitioner admitted that he thought

"we were going to throw down, or like something."  CT 183.  Thus, a factfinder could infer

an unlawful purpose from Petitioner's conduct, to wit, engaging in a gang fight or an assault

with the firearm Petitioner had given Morales, which Petitioner knew Morales was carrying

that night.  Petitioner had the (2) intent of encouraging or facilitating the commission of some

kind of fistfight or assault with a firearm as he accompanied Morales, even if he remained

five to eight feet behind him as Morales advanced toward the rival gang members.  Petitioner

(3) aided or encouraged the commission of the target crime – a fistfight or an assault with the

firearm – by providing the loaded firearm to Morales and accompanying him, even if

standing several feet behind.  Morales (4) shot and killed Saludes-Smith and therefore

committed voluntary manslaughter, which was an offense other than the target crime of a

fight or assault with a deadly weapon.  The (5) offense committed by Morales – voluntary

manslaughter – was a natural and probable consequence of the fistfight or assault with a

firearm that Petitioner encouraged or facilitated.  *Cf. Ayala*, 181 Cal. App. 4th at 1452-53

United States District Court

For the Northern District of California

(recognizing second-degree murder could be the natural and probable consequence of gang members' confrontation of rival gang members with the original intention of only getting into a fistfight because of likelihood of escalation).

Moreover, Petitioner litigated similar issues related to the sufficiency of the evidence at the trial court – and lost.  Petitioner explicitly argued in his motion to dismiss that the natural and probable consequence of intending to aid in a breach of the peace of an assault would not be murder.  CT 2278, 2287-2290 (Ex. 8, Vol. 12).  In rejecting his argument, the judge found that factors from *In re Lynette G.*, 54 Cal. App. 3d 1087, 1094-95 (1976) – presence at the scene of the crime, companionship, conduct before and after the offense, and flight – established the necessary inferences for aiding and abetting liability for murder based on the facts of the case.[4]  Moreover, the judge found that the murder of Saludes-Smith was a natural and probable consequence of several target offenses, which he identified.  He stated that the "target offense in this matter can be interpreted to be [California Penal Code] section 245(a) or 246, a negligent discharge [of a firearm].  And it is clear to me that the natural and probable consequence of 245a, which is assault with a firearm, would be murder."  RT 204 (Ex. 7, Vol. 5).  The judge's findings regarding the presence of facts supportive of possible target offenses for murder – as opposed to the lesser charge of voluntary manslaughter – reinforce the Court's conclusion that Petitioner aided or encouraged in the commission of target crimes for which voluntary manslaughter was the natural and probable consequence, specifically the fistfight and Morales' assault with the firearm.

Petitioner counters that no reasonable inferences could allow a factfinder to conclude that Petitioner had an unlawful purpose or intended to aid Morales in a fistfight or some type

[4]The judge based this finding on testimony that: the shooting occurred in a neighborhood that was primarily controlled by Norteño gang members, such that Sureño gang members – such as Petitioner and Morales – who were present would be "vigilant, particular at that hour of night, out on the street that this occurred," RT 203-04 (Ex. 7, Vol. 5); there was an on-going feud between Norteño and Sureño gang members, which was known to the participants; Petitioner knew Morales had a gun in his pocket earlier in the day and had in fact given the weapon to him; after the "[w]here are you from" challenge from Saludes-Smith, Petitioner and Morales continued walking toward the victim; Morales had the gun in his hand while he was walking toward the victims; Petitioner and Morales ran off together after the shooting; and there was an agreement that neither would say what had happened.  RT 204.

of assault – even though Petitioner had given Morales the firearm the day before and knew he had it in his possession immediately preceding the shooting – because the Norteño gang members were the aggressors. *See* Pet. at 53-56 (citing California cases for the proposition that gang membership in the aiding and abetting context tend to establish liability only where there was strong evidence that the defendants instigated the fight or that the defendant agreed to participate in the target offense). In support of this contention, Petitioner cites *Juan H. v. Allen*, 408 F.3d 1262, 1279 (9th Cir. 2005), for the proposition that "[s]peculation and conjecture cannot take the place of reasonable inferences and evidence" when evaluating whether Petitioner knew Morales had any unlawful purpose or that Petitioner took some action intended to encourage or facilitate Morales in the voluntary manslaughter of Saludes-Smith. Pet. at 41-44, 58-59. The Court nonetheless concludes that even if Saludes-Smith initially approached Petitioner and Morales, any rational factfinder could have concluded that Petitioner, Morales, and Saludes-Smith were engaged in mutual combat based on an implied agreement to fight. *Cf.* CALCRIM, Instruction No. 5.56 – Self Defense – Participants in Mutual Combat; *cf. also People v. Ross*, 155 Cal. App. 4th 1033, 1046-47 (2007) ("'mutual combat' consists of fighting by mutual intention or consent . . . there must be evidence from which the jury could reasonably find that both combatants actually consented or intended to fight before the claimed occasion for self-defense arose."). An implied agreement to fight is reasonably inferable from Morales' and Saludes-Smith's advancement toward each other, Saludes-Smith's gang challenge and Morales' answer, and Petitioner's admission that he believed they were going to "throw down." While self-defense is not squarely at issue, under "all of the factual circumstances" of the case, *Ayala*, 181 Cal. App. 4th at 1452, and given that on habeas review, the Court draws all inferences in favor of the prosecution, *Jackson,* 443 U.S. at 319, any rational factfinder could have found beyond a reasonable doubt that Petitioner had an unlawful purpose or intended to aid Morales in a fistfight or some type of assault – regardless of whether Saludes-Smith initially approached Petitioner and Morales.

    Moreover, *Juan H*. is also distinguishable because that case involved first-degree murder (along with its specific-intent requirement) versus the voluntary manslaughter charge

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

here.  In *Juan H.,* the Ninth Circuit held that it was not enough for the prosecution to merely demonstrate that the juvenile Juan H. knew that some criminal activity was afoot or that his co-defendant planned to confront rival gang members while holding a firearm – where the element needed to be proven for attempted and first-degree murder is knowledge of a specific crime his co-defendant intended to commit.  *Id.* at 1278.  The Ninth Circuit found that there was insufficient evidence to support the charges because there was no evidence that Juan H. said anything before, during or after the shootings from which a reasonable factfinder could infer an intent or purpose to aid and abet in the murder or attempted murder at issue.  In contrast, Petitioner here, though also charged with murder, pleaded no contest to voluntary manslaughter.  Petitioner gave Morales the loaded firearm and ammunition and admitted that he believed that he and Morales were going to get into a fight immediately preceding Morales' use of the gun.  Morales and Petitioner fled together following the shooting.  As discussed above, there is sufficient evidence from which a factfinder could conclude Petitioner had knowledge of Morales' unlawful purpose and aided or encouraged him in the commission of a target offense, such as getting into a fistfight or assault with a deadly weapon, sufficient to support the voluntary manslaughter charge under an aiding and abetting/natural and probable consequences theory.

Accordingly, sufficient evidence existed in the record, when viewed in the light most favorable to the prosecution, from which any rational trier of fact could have found the essential elements of voluntary manslaughter were satisfied beyond a reasonable doubt. Thus, Petitioner's First Claim fails.


### 3.    Ineffective Assistance of Counsel (Fourth Claim)

In light of the analysis above, the Court also rejects Petitioner's Fourth Claim – that his counsel provided ineffective assistance by failing to advise him that he could not be found guilty of voluntary manslaughter because of an absence of evidence supporting the factual elements necessary for conviction.  Pet. at 49-59.  Under the "doubly deferential" standards created by AEDPA for this Court's review of the state court's denial of Petitioner's

ineffective assistance claim, *Pinholster*, 131 S. Ct. at 1403, the Court asks whether there is "any reasonable argument" that Petitioner's attorney satisfied *Strickland*'s deferential standard in advising Petitioner to plead no contest to voluntary manslaughter under an aiding and abetting/natural and probable consequences theory with a gang enhancement. *Richter*, 131 S. Ct. at 788. The Court concludes that there is a reasonable argument for this proposition.

As discussed above, sufficient evidence exists in the record, when viewed in the light most favorable to the prosecution, from which any rational trier of fact could have found that the essential elements of voluntary manslaughter were satisfied beyond a reasonable doubt under the natural and probable consequences doctrine. Moreover, Petitioner's counsel unsuccessfully litigated the sufficiency of the evidence necessary to support a murder conviction in a motion to dismiss. This litigation history reinforces, rather than detracts from, the presumption that Petitioner's counsel acted with competence in advising Petitioner to plead no contest. Additionally, accepting the plea enabled Petitioner to escape a potential maximum prison sentence of 21 years. The plea offer, which dismissed the murder charge, imposed a six-year term of imprisonment when the manslaughter charge allowed for either a 3-, 6-, or 11- year sentence and the gang enhancement under California Penal Code section 186.22(b)(1)(c) provided for an additional ten-year enhancement. CT 2368-2369 (Ex. 8, Vol. 12). Advising Petitioner to plead no contest – which reduced Petitioner's potential prison sentence by 15 years – could be considered sound strategy. *Strickland*, 466 U.S. at 689.

Under AEDPA deference, there is a reasonable argument that Petitioner's counsel satisfied *Strickland*'s already "strong presumption" that the advice to plead no contest fell "within the wide range of reasonable professional assistance" given that Petitioner could have been convicted by a jury based on the facts in the case. 466 U.S. at 689. Thus, Petitioner has failed to satisfy the first prong of *Strickland*; the Court need not address prejudice because Petitioner failed to make the required showing on the first component of the analysis. *Id.* at 697. Thus, under *Strickland* and AEDPA, Petitioner's Fourth Claim fails as he has not met his burden to demonstrate ineffective assistance of counsel.

**4.      Knowing and Intelligent Plea (Fifth Claim)**

Accordingly, the Court must also reject Petitioner's Fifth Claim – that his plea was not knowing and intelligent because of ineffective assistance of counsel.  Pet. at 62-65.

The record here reflects that Petitioner, with the advice of counsel, entered into a knowing, intelligent, and voluntarily no contest plea.  On May 25, 2010, Petitioner signed a waiver of constitutional rights prior to his entry of no contest plea.  The waiver instructed Petitioner to "read and place your initials in the boxes after reading and understanding each of the statements.  If there is anything that you do not understand, ask your attorney about it before initialing." CT2360.  Petitioner indicated that he pleaded no contest to the voluntary manslaughter of Saludes-Smith.  *Id.*  He initialed the box corresponding to "I have had enough time to discuss with my attorney my constitutional rights, any defenses I may have to the charges and the consequences of this" plea.  CT 2361.  He initialed that he was freely and voluntarily entering the plea and that the initials above were his.  CT 3262.  He signed the plea waiver.  *Id.*  The court accepted the plea, which included a finding that there was a factual basis for the plea and that Petitioner understood the nature of the charges.  *Id.*  During the plea colloquy on the same day, Petitioner affirmed that his attorney went over the waiver form, that for each box he initialed, he read, understood, and discussed each initialed provision with his attorney, and that he signed the waiver.  CT 2371-72.  "Solemn declarations in open court carry a strong presumption of verity," so there is no reason to doubt Petitioner's attestations.  *United States v. Rubalcaba*, 811 F.2d 491, 494 (9th Cir. 1987) (quotation omitted)).  Moreover, Petitioner's counsel affirmed that he joined in the waiver of constitutional rights and stipulated "to a factual basis based on [his] review of the police reports and the preliminary hearing transcript."  CT 2372.  The Court then found that the plea was entered freely, voluntarily, knowingly, and intelligently, at which point Petitioner pleaded no contest to the manslaughter charge.  CT 2373.

Petitioner nonetheless argues that his no contest plea was neither knowing nor intelligent because he did not understand that he could not be found guilty without evidence that he knew that his co-defendant – Morales – intended to commit a crime and that he

1   intended to and did aid him in committing a crime.  However, because Petitioner pleaded no

2   contest upon the advice of counsel, he is limited to challenging his plea by demonstrating

3   that the advice he received from counsel did not constitute effective representation.  *Lambert*,

4   393 F.3d at 979 (citing *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978)); *Hill*, 474 U.S. at

5   56-57 (Petitioner "may only attack the voluntary and intelligent character of the guilty plea

6   by showing that the advice he received from counsel was [ineffective].").  Because, as

7   discussed above, Petitioner failed to show that the advice he received from his attorney was

8   ineffective, he has no other vehicles to challenge his no contest plea.  Therefore, his Fifth

9   Claim fails.

10      The California Supreme Court's summary denial of his habeas claims is consistent

11  with the arguments and theories discussed above, and it is not possible that "fairminded

12  jurists could disagree that those arguments or theories are inconsistent with the holding[s]" of

13  the Supreme Court.  *Richter*, 131 S. Ct. at 786.  Accordingly, Petitioner has failed to show

14  that the California Supreme Court's summary denial with respect to his First, Fourth and

15  Fifth Claims for habeas relief was contrary to, or involved an unreasonable application of,

16  Supreme Court precedent, or was based on an unreasonable determination of the facts.

17

18  **IV.   CONCLUSION**

19      For all of the above reasons, Petitioner has failed to show that he is entitled to habeas

20  relief.  Accordingly, with good cause appearing, his petition for writ of habeas corpus is

21  DENIED.  The Clerk shall enter judgment and close the file.

22      Having denied Petitioner's request for habeas relief, this Court must issue or deny a

23  certificate of appealability pursuant to Rule 11(a) of the Rules Governing Section 2254

24  Cases.  The Court DENIES a certificate of appealability because Petitioner has failed to

25  make a "substantial showing of the denial of a constitutional right" on any of his claims.

26  28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (explaining

27  that an applicant satisfies this standard where he or she shows that reasonable jurists could

28  find the issues debatable or that the issues are "adequate to deserve encouragement to

proceed further") (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)).  Petitioner may not appeal the denial of a certificate of appealability "but may seek a certificate from the court of appeals under Federal Rule of Appellate Procedure 22."  Rule 11(a) of the Rules Governing Section 2254 Cases.

**IT IS SO ORDERED.**

Dated:   03/13/14

THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT